UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TACUMA J. MWANZA,<br><br>    Plaintiff<br><br>v.<br><br>OSBORNE, et al.,<br><br>    Defendants | Case No.: 3:21-cv-00003-ART-CSD<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 34 |

This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' motion for summary judgment. (ECF Nos. 34, 34-1 to 34-24.) Plaintiff filed a response. (ECF No. 38.) Defendants filed a reply. (ECF Nos. 39, 39-1 to 39-3.)

After a thorough review, it is recommended that Defendants' motion be denied except as to defendant Rice.

**I. BACKGROUND**

When Plaintiff filed this action, he was an inmate in the Washoe County Detention Facility (WCDF). (*See* ECF No. 1-1.) He was subsequently convicted and incarcerated within the Nevada Department of Corrections (NDOC). He has since been released. The events giving rise to this action took place while Plaintiff was housed at the WCDF.

The court screened Plaintiff's amended complaint and allowed him to proceed with a Fourteenth Amendment excessive force claim against defendants Osborne and Ambrose, and a

Fourteenth Amendment procedural due process claim[1] against defendants Rangle, Barrett-Venn, and Rice regarding his placement in segregated housing.[2] (ECF Nos. 9, 29.)

Defendants move for summary judgment, arguing: (1) Osborne and Ambrose did not use excessive force; (2) Plaintiff received all the process he was due; (3) Rice did not participate in the alleged due process violation; and (4) Defendants are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

---

[1] The screening order did not construe his amended complaint as asserting a substantive due process claim.

[2] The segregated housing is referred to as "Administrative Status," and Defendants' brief clarifies that this is WCDF's term for administrative segregation or "ad-seg." (ECF No. 34 at 9:20.)

2

U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Excessive Force**

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395, n. 10 (1989). The court uses an objective reasonableness standard to determine whether the force used against a pretrial detainee is excessive. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).

"[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id*. at 397 (quoting *Graham*, 490 U.S. at 396). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*. "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. (alterations original, quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

The following is a non-exhaustive list of considerations that may be considered:

4

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396).

### 1. The Parties Differing Versions of Events

According to Osborne and Ambrose, earlier in the day on September 24, 2020, Plaintiff received a 23-hour lockdown in his cell for being disrespectful and challenging deputies when they were searching his mail. Then, when inmates were being released for nightly medication pass, Plaintiff was repeatedly hitting his in-cell intercom and using profanity so loudly that he could be heard throughout the housing unit.

They locked down the unit, and Osborne and Ambrose went to question Plaintiff. He responded: "Fuck you motherfucking bitch ass." They opened Plaintiff's cell door and instructed Plaintiff to turn away and place his hands on his head, and he complied with this command. Plaintiff was instructed to walk slowly backward towards the deputies who were still outside the cell. After taking a few steps backward toward the deputies, Plaintiff turned around and looked at the deputies and then walked to his bunk to go through a bin. Plaintiff was again instructed to place his hands on his head and walk backward toward the deputies. Plaintiff complied, and as he reached the edge of the cell, Osborne stepped inside to attempt to hold Plaintiff's right arm and hands to guide him out of the cell. At that point, Plaintiff turned toward the deputies and raised his arms. The deputies entered the cell, and Osborne grabbed Plaintiff's right arm. Plaintiff moved from side to side, as if attempting to escape their hold. The deputies removed Plaintiff from his cell, and he continued to raise his arms. When the cell door was closed, he was placed against the wall outside his cell. He was given commands to stop tensing his body, to stop

pulling away, to separate his feet and widen his legs, and to give the deputies control. Plaintiff continued to physically resist.

Eventually, the deputies were able to place Plaintiff's hands in a rear wrist-lock position, separate his legs, and place handcuffs on his wrists. Once in handcuffs, the deputies escorted Plaintiff toward the deputy station where a nurse was positioned. Plaintiff began yelling out that the deputies were breaking and twisting his wrists. Osborne explained they no longer had holds on him, and he was in handcuffs. Plaintiff then complained that the handcuffs were hurting his hands. Deputy Osborne checked to ensure there was at least a finger-sized space between the handcuffs and Plaintiff's wrists. (Osborne Decl., ECF No. 34-2; Ambrose Decl., ECF No. 34-3; Incident Report at ECF No. 34-4.)

Deputy Ferguson was summoned on the date of the incident for "CSI" purposes, and when he arrived, he noticed that Plaintiff's right wrist had slight swelling around it, and Plaintiff complained to him that the deputies had hurt his wrist and arm when they were moving him out of his cell. (Incident Report, ECF No. 34-4 at 4; Ferguson Decl., ECF No. 34-8.) In addition, Osborne's incident report acknowledges that when Osborne subsequently asked Plaintiff if he was injured, he responded that his hands hurt. (ECF No. 34-4 at 5.)

Defendants submit security camera footage that they contend supports their position. The video footage does show two deputies going to Plaintiff's cell, entering the cell, and then quickly coming out of the cell with Plaintiff, placing Plaintiff against the wall, and then escorting him to the deputy station. Defendants also include still photos taken from the video footage that show the deputies holding Plaintiff. (ECF Nos. 34-6, 34-7.)

Finally, Defendants point to various medical records to support their motion.

A record from September 25, 2020, states that no additional healthcare was needed, and Plaintiff verbalized his understanding regarding how to put in a kite for increased pain or swelling in his wrist. (ECF No. 34-10 at 6-7.)

Plaintiff was evaluated for musculoskeletal pain/strain on September 26, 2020, and complained he had been hurt on his right arm/forearm when he was "rolled up." He had limited range of motion in the affected area, and was described as "guarding," but there were no noticeable signs or symptoms of injury. (ECF No. 34-11 at 2.) Acetaminophen and ibuprofen were ordered. (*Id*. at 3.) On September 28, 2020, Plaintiff denied any medical, dental, or mental issues. (ECF No. 34-10 at 4-5.) Plaintiff also refused his medications, including ibuprofen and acetaminophen. (ECF No. 34-12 at 2.) On September 30, 2020, Plaintiff denied any medical, dental, or mental issues. (ECF No. 34-10 at 2-3.) When Plaintiff was seen for a chronic care visit two months later, there was no mention of wrist pain, though it is not clear whether he was evaluated for wrist pain at that time. (ECF No. 34-13.)

Plaintiff, on the other hand, asserts that on September 24, 2020, he was sitting in his cell and could see people through the window standing in line for pill call. He claims one of the Defendants came over the intercom and asked whether he was coming out for his psych meds (though he claims he was only taking seizure medications). Plaintiff yelled out over the intercom: "Naw fuck those pills." He disputes that he continued to push the cell intercom button, or that Ambrose or Osborne came to question him.

Osborne and Ambrose appeared at his cell door a few minutes later and ordered Plaintiff to get off his bunk, turn around, and place his hands behind his head, and Plaintiff complied. Nevertheless, Ambrose and Osborne rushed into Plaintiff's cell and grabbed Plaintiff's wrists and around his neck (with Osborne grabbing the right wrist and Plaintiff's neck and Ambrose

grabbing the left wrist). He maintains that they both began twisting and bending his wrists, causing excruciating pain, even though Plaintiff was not resisting. They then took Plaintiff out of the cell, shoved him against the wall, and Osborne placed handcuffs on Plaintiff's wrists. They continued bending and twisting his wrists even though Plaintiff was not resisting. Plaintiff was screaming out in pain the entire time, and Defendants told Plaintiff to "shut up." Plaintiff claims that a bone in his right wrist was dislocated and he had to pop it back into place after the fact. He claims he did not go to the infirmary until one hour later.

Plaintiff points to a declaration of inmate Jose Rodriguez who states that he witnessed the incident (although he references a date of September 25, 2020, when the incident occurred on September 24, 2020). Rodriguez corroborates Plaintiff's statement that he was not resisting, and the officers twisted and bent Plaintiff's wrists while Plaintiff yelled out in pain. (ECF No. 26 at 16.)

**2. Analysis**

The video footage does not conclusively establish Defendants' position, as they suggest. There is no audio, and because of the camera angles, the court cannot ascertain whether or not Plaintiff was resisting, either while coming out of the cell or while out of the cell and against the wall. In addition, there is no direct view of Plaintiff's hands, and the camera view is not close enough to see whether Osborne and Ambrose were twisting and pulling on Plaintiff's wrists. The still photos are also of little assistance. They appear to show Plaintiff with his arms up, but the deputies are holding his arms, and it is impossible to tell from the photos whether Plaintiff was lifting his arms, or Defendants were holding them in that position.

The court is left with two differing versions of events and material disputes as to: whether Plaintiff was continually pushing his intercom and yelling out profanities; whether he complied

with the deputies' orders in the cell; whether he was resisting the deputies coming out of the cell and once out of the cell; and whether Osborne and Ambrose engaged in twisting and bending his wrists causing him excruciating pain. Osborne and Ambrose acknowledge that when he was being escorted to the deputy station, Plaintiff yelled that the deputies were breaking and twisting his wrists. This is also corroborated by inmate Rodriguez. When Plaintiff continued to yell about this and was informed he was in handcuffs, he complained that the handcuffs were hurting his hands. Ferguson confirmed that Plaintiff had some swelling to his wrists.

There is also a dispute regarding the extent of his injuries. While Defendants contend that Plaintiff suffered only slight swelling to his wrists, Plaintiff provides evidence he suffered excruciating pain and that he had to pop his bone in his right wrist back into place after the incident. His medical records indicate that he did complain of wrist pain, had limited range of motion, and was prescribed ibuprofen and Tylenol.

**3. Osborne and Ambrose are Not Entitled to Qualified Immunity as to the Excessive Force Claim**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In determining whether a defendant is entitled to qualified immunity, the court considers "whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citations omitted).

The law on excessive force was clear, however, there are disputed factual issues that are necessary to determine whether Ambrose and Osborne used excessive force. Those issues must be determined first by the jury before the court can rule on qualified immunity. *See Morales v. Fry*, 873 F.3d 817, 822-24 (9th Cir. 2017). Therefore, Osborne and Ambrose are not entitled to qualified immunity at this juncture.

### 4. Conclusion as to the Excessive Force Claim

There are multiple genuinely disputed facts, and it is the province of the jury to determine whose version of events to believe. Therefore, Defendants' motion for summary judgment should be denied as to the excessive force claim.

The court notes Plaintiff makes an argument in his response that the deputies were wearing body cameras, however, they have submitted evidence that they did not have body cameras at that time, but only audio recording devices. (*See* Barrett-Venn Decl., ECF No. 39-1.) Plaintiff also argues that it went against policy to not have a third-party deputy to record the "extraction" of Plaintiff. However, Defendants present evidence that this was not a cell "extraction." (ECF No. 39-1.) Plaintiff has submitted no evidence to dispute these facts, and in any event, these facts are not material to his excessive force claim.

## B. Procedural Due Process

A pretrial detainee may not be detained under conditions that amount to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979). "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538 (citation omitted). "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be

connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it.]: *Id*. (citations omitted). "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*. at 539. "Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutional be inflicted upon detainees *qua* detainees." *Id*. (citation omitted).

In *Mitchell v. Dupnik*, the Ninth Circuit concluded that the procedural protections outlined for convicted prisoners in *Wolff v. McDonnell*, 418 U.S. 539 (1974), apply to a pretrial detainee who has been placed in disciplinary segregation as a result of an allegedly improper disciplinary hearing. *Mitchell v. Dupnik*, 75 F.3d 517, 523-25 (9th Cir. 1996). Under *Wolff*, the inmate is entitled to: (1) written notice of charges; (2) at least 24-hours between the time the inmate receives notice of the charges and the time of the hearing so he may prepare a defense; (3) a written statement of the evidence relied on and reasons for taking disciplinary action; (4) the right to call witnesses in his defense, when allowing him to do so is not unduly hazardous to institutional safety or correctional goals; and (5) legal assistance if illiterate or the issues presented are legally complex. *Wolff*, 418 U.S. at 556.

Neither the Supreme Court nor the Ninth Circuit has specifically addressed whether and when a pretrial detainee is entitled to due process protections related to non-punitive placement in ad-seg. The Supreme Court did say in *Bell*, however, that detainees "retain at least those constitutional rights that we have held are enjoyed by convicted prisoners" which includes "protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law[.]" *Bell*, 441 U.S. at 545 (citation omitted). Thus, the

procedural protections afforded to a convicted prisoner provide the floor for those protections that must be provided to a detainee.

Assuming there is a protected liberty interest, a convicted inmate in ad-seg housing for non-punitive reasons must be given notice of the reason for segregation and be provided, within a reasonable time after such placement, with an informal, non-adversary review of the evidence justifying the decision to segregate the inmate and an "opportunity to present his views" (either a written statement by the inmate or an oral presentation may suffice). *See Hewitt v. Helms*, 459 U.S. 460, 476, n. 8 (1983); *Toussaint v. McCarthy*, 801 F.2d 1080, 1100-01 (9th Cir. 1986), *both abrogated in part on other grounds in Sandin v. Connor*, 515 U.S. 472 (1995).

Unlike a disciplinary proceeding, the inmate is not entitled to "detailed written notice of charges, representation of counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation." *Toussaint*, 801 F.2d at 1100-01 (citation omitted). After being placed in ad-seg, prison officials must periodically review the initial placement. *See Hewitt*, 459 U.S. at 477, n. 9 (noting this does not necessarily require the submission of any additional evidence or statements).

Defendants do not specifically argue that Plaintiff did not have a protected interest in remaining free from confinement in ad-seg; therefore, for purposes of this analysis, the court will assume he had a protected liberty interest.[3]

**1. Punitive or Non-Punitive Segregation**

The type of procedural protections Plaintiff was due depends on whether Plaintiff was placed in ad-seg for punitive reasons, as a form of discipline, triggering *Wolff's* protections, or for non-punitive reasons, in which case the protections outlined in *Hewitt* apply.

---

[3] Instead, Defendants argue that Plaintiff received all the process he was due.

12

Here, Plaintiff's placement on administrative status was not *expressly* punitive. He was placed on "administrative" status, which in the WCDF, is a form of ad-seg. He does not contend that he was formally charged with a disciplinary violation or adjudicated guilty. Therefore, the court must look at the relationship between his segregation and the asserted non-punitive purpose.

Defendants present evidence that Plaintiff was placed in ad-seg for over 50 days for safety and security reasons: Plaintiff was being disruptive in his unit, and continued to do so even while housed in ad-seg. (Osborne Decl., ECF No. 34-2 at 4 ¶ 16; Ambrose Decl., ECF No. 34-2 at 2 ¶ 5; ECF No. 34-4 at 2.) Specifically, Deputy Ambrose states Plaintiff was yelling profanities so loud through the unit could agitate the other maximum security inmates and disrupt the housing unit's orderly operations. (Ambrose Decl., ECF No. 34-3 at 2 ¶ 4.)

Defendants submit as an exhibit Plaintiff's disciplinary records, which include several entries from September 24, 2020. The first entry that date includes the following violations: "disrespect," "disruptive," "interfere," "language" and "refuse." There is an explanation that Plaintiff had a visit outside the unit, and while searching his legal mail, Plaintiff exclaimed: "That's not how we do it in Chicago." Plaintiff was told that the items had to be searched for facility safety. Plaintiff became extremely irate and disrespectful, yelling, "fuck your lockdown." The disposition of that entry was a 23-hour lockdown. (ECF No. 34-14 at 2.)

The second entry that date includes violations of "disruptive" and "disrespect," with an explanation that Plaintiff began yelling and calling deputies "bitch ass" and "motherfuckers" because his door was not immediately opened for medication pass. The disposition for this was Plaintiff being moved to administrative status due to Plaintiff already being on a 23-hour lockdown. (*Id.*)

The final entry that day includes violations for: "challenge," "disruptive," "disrespect," "language," and "address," indicating Plaintiff became combative with deputies when being moved to the "SHU," and after he was placed in handcuffs, he began screaming, disrupting the unit, and calling deputies "bitches" and "motherfuckers." The disposition code is "A," which stands for ad-seg. (*Id.*)

Plaintiff admitted in discovery that on September 24, 2020 (before the incident with Ambrose and Osborne), he received a 23-hour lockdown consequence. (ECF No. 34-1 at 4, response to Request for Admission (RFA) No. 12.) He does not dispute the reason for his placement on lockdown for 23 hours. (ECF No. 34-14 at 2.)

Plaintiff denies, however, that he was non-compliant or resisting during the incident with Ambrose and Osborne. (ECF No. 34-1 at 5, response to RFA No. 20.) He asserts that on September 24, 2020, during pill call, one of the officers came over the intercom and asked him: "[A]re you fucking coming out for your psych meds?" Plaintiff yelled out over the intercom in response: "Naw fuck those pills." (ECF No. 38 at 6.) Plaintiff disputes Defendants' assertion that he continually yelled over the intercom. He also disputes that he was resisting and failing to follow orders once Ambrose and Osborne came to his cell.

Plaintiff refers to his segregated confinement as "ad-seg/dis-seg" throughout his response. At one point, he argues that the conditions in ad-seg mirror those in disciplinary segregation and concludes that ad-seg is used as punishment, though he provides no evidence to support this contention. (ECF No. 38 at 12.)

The court finds there is a genuine dispute of material fact as to whether Plaintiff was placed in segregation for punitive or non-punitive reasons. First, Plaintiff disputes that he was being disruptive or that he was subsequently resisting the deputies. Second, his alleged conduct

14

is listed on his "disciplinary" record from the jail. Finally, Plaintiff remained in ad-seg for over 50 days, and he disputes that he was ever actually told the reason for his placement in ad-seg.

If Defendants' version of events is believed, the jury could conclude that Plaintiff was in fact moved to ad-seg to manage disruption in his housing unit, and his continual misbehavior resulted in the length of his stay. If Plaintiff's version of events is accepted, the jury may conclude there is not a reasonable relationship between his confinement in ad-seg and his conduct, and instead, that he was being punished.

Again, the type of procedural protections that were due to Plaintiff will depend on resolution of this issue. If Plaintiff was placed in ad-seg for non-punitive reasons, he was due the procedural protections under *Hewitt*. If he was placed in ad-seg for punitive reasons, he was due the procedural protections outlined in *Wolff*. The jury must resolve the prerequisite issue before the court can consider whether Plaintiff was provided sufficient due process.

**2. Rice**

Defendant Rice argues that there is no viable claim against him.

Rice submits a declaration that he was not involved in the review of Plaintiff's administrative status from September to November 2020. Rice's only involvement was to respond to a grievance on October 31, 2020. Rice verified that Inmate Management Unit "IMU" had conducted a 30-day review of Plaintiff's status, and explained to Plaintiff his placement was due to safety and security. ( Rice Decl., ECF No. 34-22; Grievance at ECF No. 34-23; Barrett-Venn Decl., ECF No. 34-16 ¶ 9.)

Plaintiff's grievance stated that on October 22, 2020, he called to Rangle and asked about his review date, and Rangle told him that he would be reviewed and would be sent back to "GP" (referring to general population). On October 23, 2020, Rangle came to his cell and told Plaintiff

he was moving to Unit 17 (which is also "shu/dis seg/ad seg unit"), and said nothing changed about going to GP on the 25th. Rangle never came to see him. He asked to go to GP or to exhaust (administrative remedies). (ECF No. 34-23 at 2.) Rice responded on October 31, 2020: "You will be housed according to the safety and security of you and needs of the facility [sic]. Thank you." (ECF No. 34-23 at 3.)

When an official is sued under 42 U.S.C. § 1983, the inmate "must show that each defendant personally played a role in violating the Constitution." *Hines v. Yousef*, 914 F.3d 1218, 1228 (9th Cir. 2019).

The grievance that Rice responded to did not assert that Plaintiff had never been provided the reason for his placement in ad-seg, that he had not received a hearing or a lack of reviews of his status. Instead, it concerns something that Rangle allegedly told him about his being able to move back to general population.

There is no evidence that Rice played any role in Plaintiff's placement in ad-seg or in his reviews of his ad-seg status, or that he was given notice that Plaintiff had not received adequate procedural protections and failed to act. Therefore, summary judgment should be granted in Rice's favor for lack of personal participation in the alleged constitutional violation.

**3. Qualified Immunity**

As discussed above, the law was sufficiently clear that if Plaintiff was placed in ad-seg for punitive reasons, he was entitled to the procedural due process protections outlined in *Wolff*. The law was similarly clear that if Plaintiff was placed in ad-seg for non-punitive reasons, he was entitled to at least those procedural protections outlined in *Hewitt*. Whether there was a violation of those rights will depend on what protections Plaintiff was due. Therefore,

Defendants are not entitled to qualified immunity on the procedural due process claim at this juncture.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Defendants' motion for summary judgment (ECF No. 34) **except** that the motion should be **GRANTED** as to defendant Rice.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: December 18, 2023

_____
Craig S. Denney
United States Magistrate Judge